STATE OF IOWA, Appellee, v. ELSIE McHENRY, Appellant.

FEBRUARY 12, 1929.

*C. C. Putnam* and *Walter F. Maley*, for appellant.

*John Fletcher*, Attorney-general, *Carl Missildine*, County Attorney, and *Mason Ladd*, Assistant County Attorney, for appellee.

ALBERT, C. J.—I. On the 20th day of January, 1927, the sheriff of Polk County, with his assistants, and by virtue of a search warrant, made search of the property in the city of Des Moines known as 815 Twenty-ninth Street. This property was then occupied by the defendant, Gale Johnson, and Frank Petrelli, alias Frank Patterson, alias Tony, the Wop. As a result of

762

such search, numerous articles of various kinds and descriptions were found, and on January 28, 1927, an indictment was returned by the Polk County grand jury, accusing Gale Johnson, Elsie McHenry, alias Mrs. A. J. Parrish, and Frank Petrelli, alias Tony, the Wop, of "unlawfully and feloniously then and there be found having in their possession certain burglar tools and implements" (numerous articles are described in the indictment), with unlawful and felonious intent on the part of the said named parties to commit the crime of burglary. Defendant demanded and was granted a separate trial.

Defendant's counsel was advised that the case would come on for trial at 9 o'clock, Wednesday morning, May 18, 1927, and at that hour, defendant's counsel asked and demanded that the entire panel of jurors be called for this particular case, which was refused. Except for the disposition of preliminary matters which are not shown in the record, nothing was done in the case until 2:45 P. M. of the same day, at which time, and before the drawing of the jury had commenced, defendant's counsel demanded the names of all jurors in the panel to be called, and "that this case be continued until such time that the entire panel would be available in this court," from which to select a jury for the trial of this case. This request of the defendant's was overruled. The remainder of that session and a part of the morning session, until 10:20 A. M., the following day, were taken in selecting a jury in this case, at which latter time a jury was accepted and sworn to try the case. The record is wholly silent as to whether the defendant exercised any one or more or all of her peremptory challenges. She is not claiming that she did not have a fair and impartial jury, but is standing on the technical question of law to which reference will hereinafter be made.

As this court well knows, the district court of Polk County has six divisions or judges. Pursuant to law, there was called for this court a panel of jurors, and after excuses had been received, there were left in said panel 94 jurors. Prior to the time of the afternoon session on May 18, 1927, when arrangements were made to draw this jury, two of the other district judges had selected juries from the above number, which left 70 jurors in the panel from which the jury in this case was to be selected; but the defendant insists that she was entitled to have the full

panel of 94 present in court, from which her jury was to be selected. As supporting this contention, she relies on Sections 11477 and 11478, Code of 1927, reading as follows:

"11477. When a cause is called for trial, and before drawing the jury, either party may require the names of all the jurors in the panel to be called, and an attachment to be issued against those who are absent, but the court may, in its discretion, wait or not for the return of the attachment."

"11478. The clerk shall prepare separate ballots containing the names of the persons returned as jurors, which shall be folded, each in the same manner, as nearly as may be, and so that the name thereon shall not be visible, and must deposit them in a box kept for that purpose."

The question is whether or not the defendant was entitled to have the names of the full panel, to wit, 94 jurors, in the box from which her jury was to be drawn. From a practical standpoint, defendant would not be entitled to have her demand complied with, because it would necessitate the calling in of jurors already engaged in the trial of other cases, and would seriously interfere with the workings of these courts, or the continuance of this case until such a time as all of the jurors of the panel would not be otherwise engaged. In the case of *Tyler v. State*, 207 Ala. 129 (92 So. 478), the Alabama court said:

"We do not think that the trial court had to postpone this case until the twelve jurors engaged in the trial of the other case got through, or in omitting for a good excuse the other juror. It has been heretofore held, when the jury law was stricter, and the construction of the same more technical than at present, that, when some of the veniremen were engaged upon another case, the trial court could proceed without them."

In *Connor v. Salt Lake City*, 28 Utah 248 (78 Pac. 479), there, as here, were several judges in the same district. A situation existed very similar to the present, and one of the litigants insisted that he should have a right to have his jury drawn from the full panel. The court there said:

"Nor is the position of the appellant that it was entitled to have the entire panel of jurors available for the selection of the

jury in this case sound. If this were imperative as to a general panel in the trial of civil causes, then, as may easily be observed, the court, after submitting one case to a jury, would be unable to proceed with another until a verdict had been returned in the case submitted, although there might be plenty of idle and competent jurors from whom another satisfactory jury could be selected. When the length of time which juries frequently consume in arriving at their verdicts is considered, the great delay in the trial of causes which would thus be occasioned is obvious. We are aware of no law in this state that would warrant such a practice. The parties to every case at law may demand a fair and impartial jury to be selected from the panel of jurors drawn for service in the court where the case is to be tried, but whether such jury be selected from the entire panel or only a portion thereof is immaterial. If the jurors constituting the jury are competent, fair, and impartial, it is all that the law requires and the litigants can demand."

In the case of *State v. Quirk*, 101 Minn. 334 (112 N. W. 409), the Minnesota court had before it a similar question. In Hennepin County, there were six judges, and as many courts. When a case was called for trial; the names of 18 jurors were drawn from the box and sent to the court room where the case was to be tried. The next jury was drawn from the remainder of the names in the box. The defendant was demanding the right to have all of the names in the box before his jury was drawn. The court said:

"The jury law would seem to require that the names of all the jurors not serving on other cases should be in the box, but such procedure is not always possible in a county such as Hennepin. It would have been well to have complied with defendant's request in a case of this importance, in order to have reduced the possibility of error to a minimum. But the eighteen jurors were, in a general sense, serving on another case, and, as the jury in this case was actually drawn from the box in the way prescribed by statute, the liberal construction which should be given such requirements leads us to the conclusion that no substantial error was committed."

However, from this standpoint it is obvious how impracticable it would be to announce a rule that every litigant in the

Polk County court should have the right to demand that the full panel must be present before a jury can be drawn in a case. Again, we had one phase of this question before us in *State v. McClain*, 191 Iowa 750, and after reviewing the statute above cited, and *State v. Gillick*, 7 Iowa (Clarke) 287, and *State v. Edgerton*, 100 Iowa 63, we held that statutes of this kind are directory, and that a substantial compliance with the statutes was all that was required. The purpose of these statutes, as we view them, is to assure a litigant that his jury will be drawn from the regular panel so long as there are enough jurors left in the panel to satisfy the needs. As suggested in one of the above cases, all that the defendant is entitled to is a fair and impartial jury of 12 men. The right of the litigant in matters of this kind is a right of rejection, and not a right of selection. To aid the defendant by way of rejection, he is given the statutory right of peremptory challenge, in addition to the challenges for cause. The preliminary purpose of both of these lines of challenges and the right to strike names is to aid the litigant in rejecting from the jury undesirable jurors. The record does not show that the defendant exercised any of her peremptory challenges herein, but she accepted the jury. Had the record shown that defendant had exercised all of her peremptory challenges, and was yet complaining that there were others on the jury whom she wished to reject, we might have a different question. She must have been satisfied that she had a fair and impartial jury when it was accepted.

II. The evidence in the case shows that, on December 24, 1926, the Alleman Bank in Polk County was robbed, and among the articles found by the sheriff in his search of this property was a sack containing pennies. This sack was identified by a witness in the case, who was cashier of the Alleman Bank at the time, and was admitted in evidence. That the ruling of the court in this matter was correct, see *State v. Kappen*, 191 Iowa 19; *Commonwealth v. Johnson*, 199 Mass. 55 (85 N. E. 188); 16 Corpus Juris 589, Section 1137. But the defendant insists that, under the peculiar facts of this case, this rule should not apply. To understand this contention, it is necessary to recite some further facts. It appears that, about the middle of December, 1926, the defendant entered into a written lease for three months in her own name

with one Huntzinger, the owner of the property above described, and made a deposit for rent of said house, and the keys were turned over to her. At the time the search occurred, she and the two other parties indicted were found in said house. She claims that she was never in the house prior to two or three days after Christmas, 1926, except the day she signed the lease, and says, therefore, that while, under ordinary circumstances, the incidents relative to the burglary of the Alleman Bank would be admissible in such case, as going to the question of intent, it could not be binding upon her, because she was never there until long after the Alleman Bank burglary. With this we cannot agree, under the record. The question of her truth and veracity was involved in this, and it was for the jury to say, in the light of all of the circumstances of the case, whether or not her claim that she was not there until two or three days after Christmas, 1926, was a correct statement. Hence there was no error here.

III. Many other things were found by the sheriff in his search, among which is what is known in the record as Exhibit BBBB, a money sack, with some small change in it. This was  found in the kitchen of the premises above described. It was not shown or intimated in any of the testimony that this sack was in any way connected with the Alleman Bank robbery, or even that the same was stolen.

In the case of *State v. Brundige*, 118 Iowa 92, the charge was breaking and entering a railroad car, with intent to commit larceny. A pail of "Sterling tobacco" was taken from a car belonging to the Illinois Central Railway Company. The detective employed by the company who was present at the search of the defendant's house found the pail of tobacco, and also found, in a private drawer belonging to the defendant, two boxes, one of patent medicine, and the other of candy. This evidence was admitted, over objection; but later, the court withdrew the testimony as to the "patent medicine and salted peanuts," but did not withdraw the testimony relative to the candy. We there said:

"It is true, there was no evidence that the goods referred to were stolen, but it is perfectly clear that the testimony was offered for the purpose of having the jury infer that such was their character, and thereby strengthen the unfavorable infer-

ence arising from the presence of the tobacco in defendant's house. The incompetency, not to say unfairness, of such testimony is too manifest for argument, and the withdrawal thereof should be as broad as the original statement. It is true, also, as contended by the State, we have recognized the rule that, where incompetent evidence has been received, its subsequent withdrawal or exclusion by the court will ordinarily cure the error. It is, however, a rule which may easily be abused,—especially in the trial of a criminal case,—and we are not disposed to extend it beyond the precedents already established. In our judgment, there was prejudicial error in the admission of the testimony referred to.''

Many articles were taken by the sheriff and his posse from the house, when search was made, which were not designated or named in the indictment. In the case of *State v. Erdlen*, 127 Iowa 620, we held that an indictment which simply followed the words of the statute was not sufficient, but that:

''Accordingly, it must be true that any tools alleged and shown to be such as are commonly made use of by burglars, or which may be used by the possessor thereof, to enable him to commit the crime of burglary, will be sufficient to satisfy the primary requirement of the statute. The rest must depend upon the question of intent as to use. As we have seen, the purpose of an indictment is to make plainly known to the person accused the particular circumstances of his offense, and, in our view, this requirement is not met by anything less than a description which shall be sufficient to advise him what particular tools he is charged with having in possession with intent, etc. Without such description, it might well be impossible to prepare for a defense, inasmuch as the prosecution could confront the defendant upon the trial with proof of possession of any one or more of an almost indefinite number of tools or implements. This the law did not intend, and will not tolerate. Moreover, the accused is entitled to have the charge of the indictment specific and certain, to the end that, whether convicted or acquitted, he may not again be made subject to a second indictment, based upon the facts of the offense first charged.''

Under this indictment and the exposition thereof in the

case just cited, we are of the opinion that whatever articles were found in or about said house which the State claims constituted burglar tools, should have been specified in the indictment, in order to admit them in evidence. However, we are further of the notion that any other articles found in or about said house which could fairly be found to throw any light upon the character of the burglar tools in question, their use or purpose; or which could or would ordinarily be used in connection with the commission of a burglary, would also be admissible in evidence.

According to the evidence in the case, aside from the specifications of the indictment, the officers testified to the finding of many articles in the house, many of which were offered in evidence. For instance, articles of men's and women's clothing, a typewriter, dishes and glassware, 23 gallon cans of alcohol, bed linen, handkerchiefs, women's dresses, slippers, stockings, underwear, a bathrobe, some hats, men's shirts, collars, socks, underwear, ties, shoes, an overcoat, some groceries and canned goods, a ham, some butter, and coffee. None of the above articles were in any way material to the inquiries before the court, and should not have been admitted in evidence. Some of the articles which were properly admitted were claimed to be the personal property of Gale Johnson; and some others, the property of Tony, the Wop.

It appears from the testimony of the sheriff and his associates that, when he entered this house, he found three parties there, who were jointly indicted herein; that it was said that  Tony, the Wop, and the defendant occupied one bedroom, and Johnson another. The articles that were taken by the sheriff were taken from the various rooms, and the basement. It is the claim of the defendant—and not denied by the State—that none of these articles were taken from the person of the defendant, and she further claims that she was not in possession of any of these articles claimed to have been classed as burglar tools. It is shown, however, as heretofore stated, that she had made the lease for this property in her own name, and at the time of the search, she was occupying the house, together with these other two parties; and she admits having, under the name of Phalen, rented another house in Des Moines, into which they expected to move in a day or two. Under this situation, we think it is a

question for the jury to say whether or not she was in the possession of this property, within the meaning of the statute. It is not a question of ownership, but one of possession. Possession may be joint or individual, and two or more persons may be in possession of a certain thing, where they have the power of control and intent to control jointly. *Commonwealth v. Johnson,* supra; *State v. Kappen,* supra. Of course, it is to be remembered that none of these tools speak for themselves. It was a part of the duty of the State to prove that the tools were of the kind and character covered by the statute, and this was a fact question, as was the question of the possession of them.

The fact that some of this property may have been found in Johnson's room, and some of it in other parts of the house, is not controlling. As stated, it is not a question of ownership, but purely a question of possession; and the ultimate question in the case is whether or not these articles were in the possession of the defendant, within the meaning of the statute. That was a question for the jury.

IV. As to each of the individual articles properly introduced in evidence as exhibits, the primary question was whether they were of the character prohibited by statute, and whether they were, under the terms of the statute, in the possession of the defendant; and the jury would necessarily be required to pass upon these questions as to each article; hence these were questions for the jury.

V. As to the blue and the white handkerchiefs, it is the claim of the State that they were so formed or arranged as to be used as masks; but, as we have not these exhibits before us, we have no means of saying that the State's contention in this respect is not correct; and whether or not this claim was correct, was for the jury.

VI. It appears in the indictment that among other articles was a German rifle, which was found by the sheriff and his force in the house. The evidence later shows that the rifle was owned by one Huntzinger, who left it in the house when he rented it, and the sheriff later returned it to him. The objection is that, under this record, it was not admissible in evidence, and that the court, in instructing the jury, should not have included this article. With this we do not agree. As above explained, as to all of these

articles, it is not a question of ownership, but a question of possession. The jury may have concluded that it was an instrument with which burglars might arm themselves, in case they were going to commit a burglary, and it might throw light on the possession of the tools which were claimed to be burglar tools.

VII. One of the contentions made by the defendant was that she was the common-law wife of Tony, the Wop. She testifies that she first met him in St. Paul, in 1924, and later mentioned the winter of 1924, and it is subsequent to that time that the circumstances arose which she claimed constituted the common-law marriage. On cross-examination, she was asked as to her having lived at one time with a certain Bert Kennedy; also as to whether she did not know one Burnham, under the name of "Dave, the Jew," and M. M. Slater, and whether she had not gone under the name of "Smiley," during a part of the time in controversy. We think this was proper cross-examination, but it could not be made the ground of impeachment. She also denied knowledge or acquaintance of a Mr. and Mrs. Anderson, and that she lived at 1017 Linden, or 1327 Grand Avenue, St. Paul, at a time prior to the time she claims the common-law marriage was consummated, and numerous other questions of a similar character, referring to about the same time. In response to her denial of these matters, the State introduced testimony of witnesses from St. Paul who tended to contradict her denial. Many of these matters were wholly collateral, and could not be used as a basis for impeachment, nor were they admissible to negative the common-law marriage, because they occurred at times long prior thereto. The vice of introducing such collateral matters is shown by the further testimony that, when it is claimed she lived at Linden Place in St. Paul, a man came out of her apartment where it is claimed she and Tony were living under the name of Mr. and Mrs. Smiley, and this man was "beaten up terribly." This evidence was wholly inadmissible, and equally so was the statement from the witness as to what the caretaker of the building told the witness about the fight, and was prejudicial.

VIII. On cross-examination of the defendant, she was requested by the State to take a sheet of paper and a pen, and write certain names thereon, and to copy down certain dictation

made by the questioner. This was objected to on the part of the defendant as not cross-examination, incompetent, irrelevant, and immaterial. The court advised the defendant that she was not compelled to write anything, and that she should consult her attorney as to her rights. The attorney responded: "Go ahead. We are not asking her to do it; whatever counsel want done here, subject to our objections, is all right." She was then asked to write her own name and the names of A. J. Smalley and Horace A. Smalley, and also to write the following:

"Having received your book on locksmithing, we wish to state that it is very much what we needed, and covers the field quite completely. We are having a continuously growing business and lock repairing has become more than a side issue with us. There has also been a few calls for safe repairing which in the past has been turned over to another firm. Enclosed you will find 10c in stamps for postage, and if you will send the supplement to the safe repairing chapter of your book, you will greatly oblige. [Signed] H. A. Smalley."

In the testimony, among the other things introduced in evidence was a book on locksmithing; also some other writings. Defendant denied any knowledge or information relative to these matters, and denied that she had written the letter just quoted, signed "H. A. Smalley;" but, for the purpose of getting a specimen of her handwriting, to compare with writing previously introduced in evidence, this line of inquiry was pursued. We think it was a proper proceeding. More than this, at one time in her direct testimony, she denied knowledge or information of any of the exhibits set out in the indictment or in the evidence; and we think that, with this situation, the question pursued was proper cross-examination.

IX. Certain instructions were asked by the defendant which were refused, but we think the matters in the requested instructions were fairly covered by those given by the court.

The sheriff properly qualified as an expert, and gave his opinion as to various articles classed as "burglar tools." *Commonwealth v. Johnson,* supra; *Commonwealth v. Anderson,* 245 Mass. 177 (139 N. E. 436) ; *State v. Ferrone,* 96 Conn. 160 (113 Atl. 452).

X. The defendant further contends that the evidence was not sufficient to take the case to the jury. With this we cannot agree. See *People v. Donovan,* 216 Mich. 231 (184 N. W. 863); *Commonwealth v. Anderson,* supra; *Reagan v. Commonwealth,* 217 Ky. 81 (288 S. W. 1025); *Commonwealth v. Conlin,* 188 Mass. 282 (74 N. E. 351); *People v. Reilly,* 49 App. Div. 218 (63 N. Y. Supp. 18, affirmed in 59 N. E. 1128); *Scott v. State,* 91 Wis. 552 (65 N. W. 61).

Section 13000, Code of 1927, provides that the possession of burglar's tools or instruments shall be presumptive evidence of an intent to commit burglary. Under the showing made in this case, plus this presumption, there can be no question that the evidence was sufficient to carry the case to the jury.

Some minor questions are discussed, but, as they are not likely to arise on a retrial of the case, we give them no further attention.

For the errors pointed out, the case is reversed.—*Reversed.*

STEVENS, DE GRAFF, MORLING, and WAGNER, JJ., concur.