CURL, Plaintiff in error, v. STATE, Defendant in error.*

*No. State 85. Argued October 4, 1968.—Decided October 29, 1968.*
(Also reported in 162 N. W. 2d 77.)

* Motion for rehearing denied, without costs, on January 7, 1969.

476

For the plaintiff in error there were briefs and oral argument by *Ralph J. Huiras* of Port Washington.

For the defendant in error the cause was argued by *Betty R. Brown*, assistant attorney general, and *Walter J. Swietlik*, district attorney of Ozaukee county, with whom on the brief were *Bronson C. La Follette*, attorney general, and *William A. Platz*, assistant attorney general.

ROBERT W. HANSEN, J. This is a shotgun blast type of appeal, asserting nearly a dozen reasons for reversing the judgment of the trial court. The reasons given vary greatly in size. Some seem minor in nature. Some have greater thrust and raise issues of consequence. Each will be dealt with, birdshot to buckshot, in order of their importance as they appear to us.

*Repeated Instruction.*

Defendant complains that a portion of the instructions were repeated to the jury. It appears that after the jury had retired to consider its verdict, it sought reinstruction on "whether the party involved had an intent to use the gun if for the reason the gun was found in the area. I mean does this constitute an intent to use it according to the statutes." Answering the jury's question, the trial court read again the statutory sections under which the defendant was charged and repeated his earlier instruction that "armed means furnished or equipped with a weapon [sic] offense or defense." Reinstruction of a jury is a matter of sound discretion of

the trial court.[1] What the trial court elected to do was entirely proper. If he had answered more briefly that intent to use the gun was not a necessary element of the crime charged, the defendant would hardly have benefited by the briefer answer. The method of answering chosen by the trial court gives the defendant no reason to complain.

*The Telephone Call.*

On the trial of the insanity issue, the defendant took the stand in his own behalf. On cross-examination he was asked whether he had told either the jailer or anyone on the telephone that he was going to put on a show for the jury. He answered in the negative. Sergeant Gary S. Langlois of the Ozaukee county sheriff's department later testified that he and the jailer took the defendant from his cell to a room with a telephone and that, in their presence, during the course of the telephone conversation he said: "I will put on a show for the jury. I will let them know what a sanity hearing is." Defendant objected but the trial court overruled the objection on the ground that it was proper impeachment. The testimony concerning a conversation, knowingly conducted by defendant in the presence of two officers, was clearly admissible because it impeached the credibility of defendant by showing a prior statement inconsistent with his sworn testimony.[2]

---

[1] *Fehrman v. Smirl* (1964), 25 Wis. 2d 645, 131 N. W. 2d 314.

[2] 98 C. J. S., *Witnesses,* pp. 535, 536, sec. 575: "Within the general rule that a witness may be impeached by showing that at other times and places he has made statements which are inconsistent with, or in contradiction of, his testimony . . . a party to a civil action, when testifying as a witness may be so impeached by his adversary. Similarly, in a criminal case, a prosecution witness or an accused who testifies in his own behalf, or a defendant who is called to give testimony in behalf of a codefendant, may be impeached in this manner."

*Instruction On "While Armed."*

Defendant objects now to the following instruction given by the trial court:

"The fourth element of this offense requires that the defendant entered such building while armed , with a dangerous weapon. 'Armed' means furnished or equipped with a weapon of offense or defense. The Criminal Code of Wisconsin defines 'dangerous weapon' as any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm."

The instruction given is a proper one. Equally obvious is the incorrectness of the instruction proposed by the defense at the time of trial, to wit: "Armed means equipped with a weapon of offense or defense and must be displayed or referred to by the accused in connection with the crime charged." Under such definition only the member of the bank holdup gang who brandished the pistol could be charged with armed robbery.[3] In any event, the defense in no way objected to the instruction given when it was given, and the right to object now has been waived.[4]

*Intent and Intoxication.*

Defendant at the trial claimed that he could not form the intent necessary to commit the crime because of his

[3] "But one participating in an armed robbery although he personally has no gun is guilty of armed robbery on the same reasoning one participating in a robbery is guilty of robbery although he personally does not put his hand in the victim's pocket." *Carter v. State* (1965), 27 Wis. 2d 451, 454, 134 N. W. 2d 444, 136 N. W. 2d 561, certiorari denied, 383 U. S. 948, 86 Sup. Ct. 1206, 16 L. Ed 2d 211.

[4] As to waiver, *See State v. Halverson* (1966), 32 Wis. 2d 503, 145 N. W. 2d 739; *State v. Kanzelberger* (1965), 28 Wis. 2d 652, 137 N. W. 2d 419, certiorari denied, 385 U. S. 867, 87 Sup. Ct. 127, 17 L. Ed. 2d 93; *Johns v. State* (1961), 14 Wis. 2d 119, 109 N. W. 2d 490.

intoxicated and drugged condition. The defendant's counsel in his brief fairly summarizes the evidence, pro and con, on this point as follows: For the defense: Defendant testified that he passed out at 10 p. m. that evening and remembered nothing until he woke up on the floor. Defense witnesses testified that defendant was drunk or befuddled at noon, early in the afternoon and between eight and nine p. m. on the evening of the safecracking. For the state: Sgt. Rudolph testified that when he ordered defendant out from under the jeep, defendant said, "Don't shoot, I am unarmed, I will come out."; and that defendant did not appear excited or nervous; that he did not stagger and did not appear to be in a stupor. Officer Cooper testified that defendant at the scene did not appear too excited, nervous or in a stupor. Another state witness testified that defendant, when brought to the jail, was steady on his feet, slightly nervous, uncommunicative, did not smell strange or odd. Defense counsel in his brief asks how the defendant could be so drunk from liquor and drugs at 9:30 p. m. yet be sober enough at 2:15 or 2:30 the next morning, four or four and one-half hours later, to form an intent to commit a burglary or a burglary while armed. Whether or not intoxication (not a hangover, but a holdover) continued for the period of time involved was for the jury to decide. The credibility of witnesses was for the jury to determine.[5] Clearly, there was credible evidence that the jury found convincing that the defendant was in the possession of all his faculties at the time the safe was burglarized.

*Gun in the Suitcase.*

Defendant argues that the trial court should not have admitted into evidence a suitcase containing tools, a

[5] *State v. Stevens* (1965), 26 Wis. 2d 451, 132 N. W. 2d 502; *State v. John* (1960), 11 Wis. 2d 1, 103 N. W. 2d 304; *State v. Lombardi* (1959), 8 Wis. 2d 421, 99 N. W. 2d 829.

loaded gun and fruits of the crime. The suitcase or satchel in question was lying open a foot or a foot and one half from the tipped over safe. It contained burglary tools, a loaded revolver and certain property which had been stolen from the safe. Other tools were lying on the floor near it. The state contends that the suitcase was found at the scene of the crime and the various items in it constituted circumstantial evidence which was admissible to prove various elements of the crime. We agree. Along with the evidence that the doors had been jimmied and the premises forcibly entered, the burglar tools relate to the element of intentional entry to burglarize. The gun relates to the element of entry "while armed with a dangerous weapon." The items in the satchel such as the notary seal and coin box taken from the safe relate to the element of entry "with intent to steal." Defendant's brief appears to assert that, unless someone observed the burglars entering the building, suitcase in hand, all evidence in reference to the suitcase must be excluded. It is rare enough that safecrackers are interrupted by the police while emptying the safe. It would be rare indeed that they would also have been observed earlier carrying their tools to do the job. The test of admissibility of circumstantial evidence is not that narrow. Evidence of guilt at the scene of the crime need not be held in the hand of the criminal suspect.[6] "Possession" may be constructive possession, meaning that the item is immediately available and under the control of the persons charged with the crime. Also,

---

[6] 29 Am. Jur. 2d *Evidence*, p. 325, sec. 288: "It is a well-established principle of criminal law that evidence of guilt found upon a person under legal arrest for a crime may be used in evidence against him. Whatever is found upon his person or in his possession which was a part of the means by which he accomplished the crime, whether an instrument, device, or token, is legitimate evidence for the prosecution and may be taken from him and used for that purpose."

where a proper foundation has been laid to establish the joint participation of several persons in an undertaking, possession may be joint.[7] Under the facts and circumstances here presented, we hold that the suitcase and contents, including the tools, loaded revolver and stolen property, were properly admitted into evidence because they constituted circumstantial evidence relating to essential elements of the crime charged.

*Earlier Hospitalizations.*

Defendant contends strenuously that it was error for the trial court to refuse to admit evidence on the issue of guilt that the defendant had been earlier treated at mental hospitals in Idaho and Wisconsin. In this case the defendant demanded and received a bifurcated or split trial separating the determination of guilt and the determination of sanity at the time of the offense. On the trial of the issue of insanity, defendant was allowed to testify about his prior hospitalizations in treatment facilities for the mentally ill. On the trial of the issue of guilt, he was not permitted to testify as to such earlier hospitalizations but was permitted to testify that on the day of the safecracking he had consumed 17 ounces of whiskey, four ounces of cough syrup, 12 Librium pills and 16 Darvon pills. Two doctors called by the defense answered hypothetical questions to state that a person who had consumed such amount of alcohol and drugs would have been intoxicated and incapable of forming the intent required for the commission of the crime of armed burglary at the time the crime was committed.

---

[7] "Accordingly, three persons may be found to be in possession of burglary tools jointly, where the circumstances, as in this case, indicate the power of control and the intent to exercise joint control over them." *Commonwealth v. Thurman* (1950), 167 Pa. Super. 642, 645, 76 Atl. 2d 483, citing *State v. McHenry* (1929), 207 Iowa 760, 223 N. W. 535.

The defense's offer of proof on the "guilt" portion of the trial with respect to his hospitalization was (1) as to the defendant having been in a mental hospital in Idaho in 1960 and then being diagnosed as a paranoid schizophrenic, and (2) as to defendant being in a mental treatment facility in Wisconsin from March, 1961, to July, 1963, with the drug, Librium, being prescribed for him. The narrow question presented is whether such earlier hospitalizations, material on the issue of insanity, were also material on the issues of intoxication and intent. We agree with the trial court that they were not. Both are earlier episodes in the life of the defendant, remote in time, that cannot be given continuing significance on the issue of defendant's intent or intoxication on the date of the offense. To bifurcate a trial is to separate completely the issue of lack of accountability due to insanity from the issue of whether the crime was committed. If the testimony of earlier hospitalizations and mental condition at such earlier times is also material on the issue of guilt, there would be no reason to hold split trials. All testimony as to mental condition would be in the record before the trial on insanity began. This would split the issues, but not the testimony or areas of inquiry. At the least, it would require medical witnesses to appear twice at the same trial to give identical testimony. At the most, it would destroy the very reason for bifurcating the trial, to wit: separate consideration of separable issues.

Actually, what defense counsel appears to be contending is that, even if not insane and even if accountable for his actions, under the law a person by reason of a personality disorder, may be more prone to become intoxicated or less able to form an intent to commit a crime. He cites an 1898 decision in this court,[8] stressing the terms "abnormal mental condition" and "disordered

[8] *Hempton v. State* (1901), 111 Wis. 127, 86 N. W. 596.

mental condition however produced," as requiring trial courts to establish and consider the psychopatholgy of legally sane persons in determining the fact of intoxication or the fact of intent. Courts, commentators and lawmakers disagree on what the legal test for insanity, the measuring stick for accountability for one's actions, should be. They agree that there must be such test or measuring stick. The concept that the psychological problems or emotional disorders of a legally sane person may be a determinant of his intent, his intoxication or test of his guilt is not in the criminal statutes or criminal law as we see it. If there can be found in the 1898 decision the suggestion that the personality dysfunction or dyscontrol, short of psychosis or insanity, is a relevant factor in the determination of guilt, we expressly disavow it. It may well be that all criminal behavior connotes some degree of personality disorganization. It may well be that, far short of actual psychosis, the personality with a paranoid flavoring may have less room to maneuver in forming intent or resisting impulses to engage in criminal or antisocial acts. Much has been written on the role of the emotions in patterns of human behavior and in the causation of crime.[9] However, at best a courtroom makes an awkward psychiatrist's couch. Judge and jury ought not be required to identify, classify and evaluate all categories and classifications of human behavior beyond the establishing of the fact of sanity. Even acknowledged experts in behavioral sciences disagree on personality classifications,[10] as well

[9] For example: Karl Menninger, *The Vital Balance: The Life Process in Mental Health and Illness,* 1963; Franz Alexander, *Psychoanalysis of the Total Personality,* 1930; Hugo Staub, *The Criminal, the Judge and the Public,* 1931; William Healy, *Roots of Crime,* 1935. *Also:* Sheldon Glueck and Eleanor T. Glueck, *Five Hundred Criminal Careers,* 1930.

[10] "Classifications owe their existence, as Riese neatly put it, to an economizing principle of the human intellect . . . But there are many pitfalls, fallacies and sources of error implicit in the

as on their application to individual cases. In the law the dividing line as to accountability or nonaccountability due to mental condition is the test of sanity, whatever the legal definition of these terms may be or come to be. The sane person is held accountable for his actions. The insane person is not. Personality disturbances or emotional disorders that fall short of insanity are not required areas of court inquiry and particularly not in that portion of a bifurcated trial on the issue of guilt.

### Insufficient Evidence?

Defendant placed heaviest reliance upon his assertion that there is no credible evidence to support the verdict of the jury, particularly claiming that no link between him and the gun in the suitcase was established. The opened suitcase was on the floor of the service area when the officers arrived, one foot or so from the defendant's colleague and ten feet or so from the defendant who was then under the jeep. Defense counsel argues that no bridge has been built in this case to cross that one foot or ten feet of distance involved. It is important to remember that the suitcase contained not only burglar tools and a loaded revolver but also a notarial seal and coin box that had been removed from the opened safe and placed in the suitcase. The emptying of the safe was still going on when the officers came onto the scene. It is difficult to see even a possibility that anybody except the defendant or his accomplice could have placed the stolen articles in the suitcase. It is impossible to find a reasonable explanation for the presence in the

irrepressible work of classification. These have been of particular interest to our colleague Henri Ellenberger who suggests that the kinds of classes established with the grouping of phenomena may be unconsciously determined by factors quite other than some objective facts intrinsic in the data classified, for example, by social traditions or assumptions inextricably impressed in the classifier's view of the world." Karl Menninger, *The Vital Balance: The Life Process in Mental Health and Illness, ibid.* p. 15.

suitcase of the items belonging in the safe other than that defendant or his colleague put them there. Actually, defense counsel does not as spiritedly deny the linkage between suitcase and defendant plus accomplice. In his brief, he concludes ". . . therefore the defendant and his accomplice were only guilty of burglary, but not of burglary while armed." The separation of the contents of the suitcase involved in this argument cannot be made. If the defendant and his accomplice are linked to the suitcase, the tools and the stolen articles, they are linked to the gun as well.

Defense counsel stresses that the gun was not proved to have been in the "possession" of the defendant, meaning it seems that the defendant did not handle or carry the gun. Counsel quotes Webster's dictionary as defining "armed" as "bearing arms." This evokes a mental image of a cowboy, six-shooter strapped to his side, or of a soldier, rifle carried on his shoulder. That is too narrow a definition of the term. A man is "armed" within the meaning of the armed burglary statute when the dangerous weapon is within his immediate control and available for use.[11]

Of course, the evidence in this case is largely circumstantial evidence. That is not fatal.[12] In fact, this is a

[11] "On the other hand, the driver of an automobile goes armed, within the meaning of sec. 340.69, Stats., when he has a dangerous weapon within reach on a shelf in back of his seat." *Mularkey v. State* (1930), 201 Wis. 429, 432, 230 N. W. 76.

[12] "The type of reasonable certitude required in criminal cases is moral certainty relating to the affairs of human conduct and grows out of informed experience with the common ways (mores) of man. . . . Based upon long experience with the actions and motives of human nature, certain inferences of conduct may be drawn from various circumstances to a moral certainty. This is not to say that exceptions and possibilities may not exist but such possibilities in themselves do not prevent a person from forming a reasonable conviction beyond a reasonable doubt or to a moral certainty of the truth of a fact. This degree of certainty required to sustain a criminal conviction may be attained upon circum-

very strong case of very convincing circumstantial evidence. Defense counsel appears to contend that circumstantial evidence by its very nature does not exclude all other possibilities. That is not the test. Recently, this court stated that "it is not every possibility that must be removed before a conviction can be sustained, particularly where there is no evidence at all on which to base a reasonable alternative hypothesis as to what happened." [13] Before the jury was ample credible evidence, albeit circumstantial, from which to conclude that the suitcase and the gun had been carried onto the premises by the defendant and his accomplice and when the defendant and accomplice entered the building, one or the other carrying the suitcase, both entered "while armed."

Defendant in his brief "concedes that if evidence had been introduced that defendant's accomplice had possession of or owned the gun or the satchel, pouch or suitcase, that the defendant would have been 'concerned in the commission of the crime (namely armed burglary)' . . ." On the record in this case, there is ample evidence from which a jury could conclude that the defendant and his accomplice together forcibly entered the building, that they shared the intent to steal and design to burglarize, that they together moved the 800 pound safe to the service area, that one or the other of them carried the suitcase with the loaded revolver and burglary tools into the building. Under the complicity doctrine, [14] what either did both did; and both became possessors of the gun as full partners in the ill-destined joint venture of armed burglary.

On appeal in a criminal case, the test as to sufficiency of the evidence to support the verdict is whether the

stantial evidence as well as upon direct evidence." *State v. Johnson* (1960), 11 Wis. 2d 130, 136, 104 N. W. 2d 379.

[13] *State v. Eberhardt*, ante, p. 175, 178, 161 N. W. 2d 287.

[14] *See* sec. 939.05 (2) (b), Stats., and *State v. Nutley* (1964), 24 Wis. 2d 527, 554, 555, 129 N. W. 2d 155, certiorari denied, 380 U. S. 918, 85 Sup. Ct. 912, 13 L. Ed. 2d 803.

evidence, circumstantial or direct or a combination of both, adduced, believed and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt. In this case, it most certainly was. The verdict of the jury and the judgment of the trial court are sustained by the evidence.

*By the Court.*—Judgment affirmed.