STATE EX REL. KANIESKI, Petitioner, v. GAGNON, Warden, Respondent.

*No. State 122. Argued February 3, 1972.—Decided March 2, 1972.*
(Also reported in 194 N. W. 2d 808.)

For the petitioner there were briefs and oral argument by *Charles D. Hoornstra* of Madison.

For the respondent the cause was argued by *Mary V. Bowman*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general, and *Sverre O. Tinglum*, assistant attorney general.

WILKIE, J. Two issues are presented by this petition:
1. What is the scope of this court's review in this habeas corpus proceeding?
2. Was the evidence sufficient to sustain the conviction?

*Scope of review.*

An action for habeas corpus is a collateral proceeding which normally can be used to raise questions concerning the jurisdiction of the convicting court, the validity of the conviction as against a charge that the law under which the defendant was convicted is void, and constitutional defects in the conviction process; it is normally not used to raise such questions as the sufficiency of the evidence.[5]

In the present case, however, defendant was convicted long before the United States Supreme Court ruled that an indigent criminal defendant has the right to appeal from his conviction with court-appointed counsel.[6] In 1952 any appeal of his conviction as an indigent criminal defendant was governed by the provisions of sec. 357.26, Stats. 1951,[7] whereunder an appeal was not

---

[5] *Cf. State v. Langston* (1971), 53 Wis. 2d 228, 231, 191 N. W. 2d 713.

[6] *Douglas v. California* (1963), 372 U. S. 353, 83 Sup. Ct. 814, 9 L. Ed. 2d 811.

[7] "357.26 **Counsel for indigent defendants charged with felony; advice by court.** . . .

"(3) If appointment of counsel has not been so made as to include services upon appeal or writ of error, or if no counsel was appointed in the trial court, the supreme court or the chief justice, upon timely notice to the district attorney and upon being satisfied that review is sought in good faith and upon reasonable

a matter of right but a matter for the discretion of this court. Defendant did not appeal his conviction and was not afforded an appellate review. Under these special circumstances and in accordance with this court's 1968 opinion, this court invited the present habeas corpus in order to afford the defendant an opportunity to raise questions he could have raised on an appeal.

### Sufficiency of the evidence.

While the state must prove defendant's guilt beyond a reasonable doubt,[8] on appeal this court's review is limited to determining whether the evidence adduced, believed and rationally considered by a jury was sufficient to prove defendant's guilt beyond a reasonable doubt.[9] Reversal is required only when the evidence considered most favorably to the state and the conviction is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as beyond a reasonable doubt.[10]

A review of the evidence presented in this case demonstrates that as a matter of law no trier of fact could be convinced that defendant was guilty beyond a reasonable doubt.

grounds (or if the appeal or writ of error is prosecuted by the state) may appoint counsel to prosecute or defend such appeal or writ of error. If no counsel was appointed in the trial court, the defendant shall be required to show his inability to employ counsel. Upon the certificate of the clerk of the supreme court the county treasurer shall pay the attorney such sum for compensation and expenses as the supreme court allows."

[8] *In re Winship* (1970), 397 U. S. 358, 364, 90 Sup. Ct. 1068, 25 L. Ed. 2d 368.

[9] *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725.

[10] *State v. Davidson* (1969), 44 Wis. 2d 177, 200, 170 N. W. 2d 755.

1. *Direct or Scientific Evidence.*

The direct or scientific evidence found at the scene of the crime lacks sufficient probative value to convict the defendant. This conclusion follows from a consideration of the particular items of direct evidence presented on the trial: pubic hair, rope surrounding deceased's neck, insulation material, rug strands, and dog hairs.

(a) *Pubic Hair.* Human pubic hair was found at the scene of the crime. The technician from the state crime laboratory compared this pubic hair with a sample of hair taken from the defendant. His testimony was that the hair found at the scene "could have had a common source" with that taken from the defendant, although it could not be identified as defendant's hair. The analyst further testified that the "common source" could be any human being. Considering that the tavern was a known place of prostitution, the discovery of pubic hair near the body has even less relevance.

(b) *Rope.* A rope found around deceased's neck contained material which was said "could have had a common source" with defendant's trousers. There is no testimony as to how common this material was. The state laboratory employee said that he could not say that the material did come from defendant's trousers. This is not enough to support the conviction. The expert witness could not testify that the fiber came from defendant's clothing and the jury, therefore, could not be more certain than the expert witness in passing upon such evidence.[11]

(c) *Insulation Material.* Certain insulation material was found on the bedspread and also on the defendant's trousers. But again, the expert stated only that the material "could have had a common source." He also could not say how long the material was on either the bedspread or the trousers.

---

[11] 23 C. J. S., *Criminal Law*, pp. 500, 501, sec. 891; *Thomas v. State* (1947), 150 Tex. Crim. 540, 545, 203 S. W. 2d 536.

**(d)** *Rug.* Fibers from a rug in the victim's room "could have had a common source" with fibers removed from defendant's trousers.

**(e)** *Dog Hairs.* Certain dog hairs were found on the defendant's person which "could have come from a common source" as that of Miss Bates' dogs. The record shows that the defendant frequently played with the dead woman's dogs.

The state concedes that under the 1954 decision of *State v. Bradley* [12] evidence which "could have come from a common source" is not sufficiently probative to prove defendant's guilt beyond a reasonable doubt. That decision, in the absence of any statement that the ruling would be prospective only, was retrospective in operation and hence was applicable to the trial in this case. [13]

The attorney general argues that all of these bits of "common source" evidence, coupled with the failure of defendant to advance any reasonable theory of innocence regarding this evidence, presents a situation in which a jury could find defendant guilty beyond a reasonable doubt. The direct evidence simply did not have enough probative value to convict this defendant. The testimony of the state crime laboratory's technician saying that the items "could have had a common source" with the defendant or his clothing did not sufficiently establish a tie-in so that the jury could have concluded therefrom that the defendant committed the alleged crime.

### 2. *Circumstantial Evidence.*

The state theorized that between 1 a. m. and 2 a. m. on Sunday morning, June 29th, defendant returned to the Bates' tavern where he had been about 12:20 a. m. The state further theorized that when he returned to the tavern he raped and killed Miss Bates. There is no evidence to place the defendant in the proximity of

[12] (1954), 267 Wis. 87, 88, 64 N. W. 2d 187.

[13] *State v. Ritchie* (1970), 46 Wis. 2d 47, 174 N. W. 2d 504.

the tavern after 12:20 a. m. Further, the state concedes that there was no evidence of motive on the part of defendant. Defendant did testify that from the Bates' tavern he went to the Worzella tavern where he stayed until approximately 1 a. m. He had had several drinks and was having trouble with his car. The ride from the second tavern to his home normally took twenty minutes but on this occasion he testified it took one hour. He stated that he could not be certain of the time because of his intoxication and because he had no watch. Even though defendant was confused and vague about this period of time from 1 to 2 a. m., the state was required to produce some evidence that placed the defendant in the proximity of the tavern after 12:20 a. m. This it failed to do and a reasonable jury could not draw a conclusion placing the defendant at the scene at the crucial time.

Recently in *Bautista v. State* [14] this court had the occasion to discuss the standard of review in cases relying upon circumstantial evidence:

". . . A criminal conviction can stand based in whole or in part upon circumstantial evidence. The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted. Our review of the record in response to a challenge to the sufficiency of the evidence is so limited by these rules." [15]

The precise question in this case on this point thus becomes whether it was reasonable to draw the in-

[14] *Supra,* footnote 9, at page 223.
[15] *See also: State v. Johnson* (1960), 11 Wis. 2d 130, 135 *et seq.,* 104 N. W. 2d 379.

ference that because defendant may have taken forty minutes more to go home from the tavern he stopped at the tavern to rape and murder Miss Bates. The only evidence of this fact is the circumstantial evidence—there is no direct evidence.

A jury may draw reasonable inferences from facts established by circumstantial evidence, but it may not indulge in inferences wholly unsupported by any evidence.[16] The inferences must be supported by facts, and the defendant cannot be convicted on mere suspicion or conjecture.[17] In this case, taking the evidence most favorable to the state, we find that the only established fact is that defendant took forty minutes too long in getting home. There is no fact to support the proposition that he went back to the Bates tavern, that he had some reason to kill Miss Bates, or that he committed the crime.

### 3. Conclusion.

The direct scientific evidence is not sufficient to support conviction and the circumstantial evidence is not based upon sufficient facts so that a jury might reasonably infer defendant's guilt. Therefore, the state's burden of proof was not met as a matter of law. The petitioner is thus entitled to release from custody and his freedom, without the possibility of a new trial.[18]

Because reversal is required by the insufficiency of the evidence it is unnecessary to consider the other issues raised by the defendant here.

*By the Court.*—The petitioner having had a hearing such as he would have had, had the writ of habeas corpus

---

[16] *People v. Weyonen* (1929), 247 Mich. 308, 311, 225 N. W. 552.

[17] 23 C. J. S., *Criminal Law*, pp. 539, 540, sec. 902; *Miller v. State* (Fla. Sup. Ct. 1954), 75 So. 2d 312, 315.

[18] *Cf. State v. Muhammad* (1968), 41 Wis. 2d 12, 23, 162 N. W. 2d 567.

been issued, it is considered that the issuance of the writ be omitted and it is adjudged that the judgment of the circuit court is vacated and that the warden of the Wisconsin correctional institution is directed to release the petitioner.

ROBERT W. HANSEN, J. *(dissenting)*. Nearly twenty years ago, the defendant was found guilty of murder in the first degree. The jury found him guilty of the fatal strangling of a seventy-six-year-old woman. The trial court upheld that jury verdict and sentenced the defendant to life imprisonment. The principal issue on appeal is the sufficiency of the evidence to support that verdict. The test is ". . . whether the evidence, circumstantial or direct or a combination of both, adduced, believed and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt. . . ." [1] The decades-old transcript reveals that evidence, adduced by the state, which the jury was required to consider and entitled to believe, established that:

*The defendant was a frequenter of the tavern owned and operated by the lady who was strangled.* The defendant admitted that he had concocted, in order to impress the elderly lady, a false story of his being an aviator. Defendant stated that he had built up her hopes by stating he would fly her to Indiana. Defendant stated that he thereafter showed up at the tavern, wearing a bandage, pretending to have had an accident that would prevent his flying her to Indiana.

*On the night of the murder the defendant appeared at the lady's tavern at about midnight.* Five customers who were in the tavern so testified, and the fact is not dis-

[1] *Curl v. State* (1968), 40 Wis. 2d 474, 488, 489, 162 N. W. 2d 77, certiorari denied, 394 U. S. 1004, 89 Sup. Ct. 1601, 22 L. Ed. 2d 781.

puted. *The lady who was later killed immediately ignored the other customers and engaged in a quiet, private conversation for about fifteen minutes.* The five tavern patrons so testified.

*After midnight, the defendant left the tavern, whereupon the lady who was later slain appeared somewhat excited, and, even though it was before the closing hour, announced that she was closing the tavern and hurried the five other patrons out of the tavern.* This was the testimony of the five patrons who were asked to leave so that the lady could close her tavern. *Defendant admitted that he was the man in the tavern who had the conversation with the victim of the slaying.*

*As the group of five patrons drove away, an automobile was noticed by some of them, parked alongside the road, pointed toward the tavern, a man behind the wheel.* This was testified to by those who made the observation. *The defendant admitted that he had parked beside the road after leaving the tavern.*

*The seventy-six-year-old lady was murdered between the time she closed the tavern and fifteen hours thereafter.* The doctor who performed the autopsy testified that the elderly lady had been battered about the face and head and strangled and that she had died at about 3:15 a. m. with a possible leeway of twelve hours in either direction. The testimony was that the murder was extremely bloody with bloodstains found on both the walls, floor and ceiling of the death room. The defendant's wife testified that on the day after the murder she had scorched and then burned the shirt the defendant was wearing on the night of the murder. The defendant testified that on the day after the murder he removed and replaced the soles of the shoes he was wearing the night of the murder and threw the resoled shoes in his attic.

*The defendant had the opportunity to commit the murder.* Defendant's testimony was that, after he left the tavern of the victim after midnight, he went to another tavern which he left at 1 a. m., arriving home at 2 a. m. He testified that this drive normally took twenty minutes, but on this occasion it took one hour. His wife testified that defendant arrived home at 1:45 a. m. to 2 a. m. However, a neighbor testified that, at 2 a. m., he had observed no car at the place where the defendant customarily parked, testimony which, believed by the jury, added an uncertain hour of returning home to the unexplained forty additional minutes en route. Additionally, the defendant testified that he did not go into the house when he returned home the night of the murder but, instead, slept in his car because it was a warm evening. Defendant's wife testified that she did not hear the car being driven away, but, given the conflict between the testimony of the wife and neighbor as to time of arrival, the jury was not required to believe such testimony nor to find it fully negativing the possibility the car was driven away later in the early morning hours.

*The defendant's arms were scratched after the murder.* The defendant gave various explanations from the witness stand as to how the scratches came about. To one inquiry he answered that the scratches on his arm were sustained while he was working on his job the day after the murder. To another inquiry in the same regard he stated the scratches were received by him while he was picking blueberries the day after the murder. On this point and throughout the trial, the defendant's testimony was marked by variations and contradictions, a factor the jury was entitled to take into consideration in evaluating his testimony.

*The defendant, stopping at the tavern two days after the murder and finding it closed, asked a neighbor to*

come over to the tavern before entering it. The defendant, according to his testimony, went with his wife to the tavern, found the tavern closed, went to the back and heard a noise and then secured the presence of a neighbor as a witness before proceeding further. It was his testimony that, because he had a criminal record, he did not want to check further unless a witness outside the family was present to also see what there was to be seen. The arranging for a witness before discovering what had gone wrong inside the closed tavern because of a prior involvement with the law is not unbelievable, but it is not the only inference that a reasonable person might draw from the reluctance to proceed, without an additional witness, to ascertain why the tavern was not open for business.

*Pubic hair found on the bedspread where the victim's body was discovered was identical with pubic hair of the defendant in medullation, pigmentation, color, size and degree of curl.* The expert witness who compared the pubic hair of defendant with that found on the bedspread testified: ". . . I found hairs to be present in the debris recovered from the bedspread, at least one of which when compared with the aid of comparison microscope to be identical with respect to certain microscopic characteristics with hairs submitted as being pubic hair from Mr. Kanieski, state's exhibit nine. These microscopic characteristics are the same as those I mentioned earlier, medullation, pigmentation, color, size and degree of curl. . . ."

*Clothing fiber found on the rope with which the victim was strangled to death was identical with the fabric of trousers worn by defendant on the night of the murder in regard to type, color, size and degree of curl.* The expert witness who compared the fiber in defendant's trousers with that found on the death rope testified: "From the debris removed from the lacing and hemp

twine in state's exhibit twelve I found a dark reddish purple clothing fiber which possessed identical microscopic characteristics as there is present in the fabric of the trousers, state's exhibit ten, and those characteristics which were used in the comparison of these fibers was the type, color, size and degree of curl." Asked if the two compared fibers were identical in all these respects, the expert witness answered, "Yes, sir."

*Fragments of insulation material found on the bedspread where the body of the victim lay were found to be identical with fragments of insulation material removed from the trousers defendant wore on the night of the murder in respect to color, texture, hardness and chemical composition.* The expert witness who compared the two sets of fragments testified, "As a part of the debris removed [from the defendant's trousers] a very small, two very small fragments of insulation material were found to be present. The chemical nature of the material was calcium carbonate and mica was found to be present in one case and the mica was identified as being the biotite type. This material was examined chemically as I mentioned and compared chemically and microscopically with the insulation material which I have testified to as being removed from the debris from the bedspread, state's exhibit eight. The material from the trousers was found to be identical with respect to color, texture, hardness and chemical composition and inclusions referring specifically to the biotite with the material recovered from the bedspread." The witness then testified, "It is my opinion that the insulation material from the trousers and the insulation material from the bedspread could have had a common source." Then asked, "In other words, at one time it could have been one piece, is that what you mean . . . ?" the witness answered, "That is correct." Asked whether the insulation material from defendant's trousers was "iden-

tical in all respects" with the insulation material from the victim's bedspread, the witness replied, "They were identical in the respects that I have mentioned."

Was this evidence ". . . circumstantial or direct or a combination of both, adduced, believed and rationally considered by the jury . . . sufficient to prove the defendant's guilt beyond a reasonable doubt?" [2] The writer has no hesitance in finding that it clearly was. As the majority opinion notes, the ". . . credibility of the witnesses and the weight of the evidence is for the trier of fact. . . ." [3] This court, on appeal, is to ". . . view the evidence in the light most favorable to the finding. . . ." [4] Reasonable inferences drawn from the evidence ". . . can support a finding of fact." [5] If more than one reasonable inference can be drawn from the evidence, ". . . the inference which supports the finding is the one that must be adopted." [6]

While it is apparent that most of the evidence against the defendant is circumstantial, this court has stated correctly that ". . . Circumstantial evidence may be and often is stronger and as convincing as direct evidence." [7] Here, buttressed by entirely reasonable inferences drawable from the chain of circumstantial evidence, it is a strong and satisfactory foundation for the jury verdict. While an appellate court ". . . cannot function as a trial court or as a jury," [8] the writer finds no reason to disagree with a jury finding of guilt based on evidence, direct and circumstantial, that clearly ". . . taken together" is ". . . of a conclusive nature leading on the

---

[2] *Id.* at page 489.

[3] *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725.

[4] *Id.* at page 223.

[5] *Id.* at page 223.

[6] *Id.* at page 223.

[7] *State v. Johnson* (1960), 11 Wis. 2d 130, 134, 104 N. W. 2d 379.

[8] *Id.* at page 137.

whole to a satisfactory conclusion and producing . . .
a reasonable and moral certainty that the accused and
no other person committed the offense charged . . . ." [9]
Holding the evidence sufficient to sustain the verdict
and finding no merit in other issues raised on this
appeal, the writer would affirm.

I am authorized to state that Mr. Justice LEO B.
HANLEY joins in this dissent.