STATE, Respondent, vs. WROSCH, Appellant.

*May 8—June 3, 1952.*

*Dennis M. Sullivan* and *Eugene J. Sullivan,* both of Milwaukee, for the appellant.

For the respondent there was a brief by the *Attorney General* and *William J. McCauley,* district attorney of Milwaukee county, and *Joseph E. Tierney,* deputy district attorney, and oral argument by *Mr. Tierney.*

BROADFOOT, J.   The first contention of the defendant upon this appeal is that the trial court erred in denying her motion for a new trial upon the ground that the verdict was contrary to the evidence and perverse.  She argues that there is no credible or competent evidence of the fact that decedent died of arsenic poisoning and that the verdict of the jury is based upon a mere suspicion of guilt.  This contention requires a review of some of the evidence in the case.

The defendant and Bernhard Wrosch were married in the year 1938.  At that time he was fifty-seven and she was thirty-four years of age.  It was the second marriage for each of the parties.  At the time of the marriage the defendant was employed by the Nash-Kelvinator Company and she continued to work for that company up to the time of her trial.  Bernhard Wrosch was employed by the Milwaukee Electric Railway & Light Company as a streetcar motorman.  Approximately five years before his death Bernhard Wrosch retired upon pension, and he was unemployed thereafter.

The Milwaukee Electric Railway & Light Company maintains an organization known as "The Employees Mutual Benefit Association" and retired employees as well as active employees are entitled to medical services under the rules of that association.  On April 26, 1949, Mr. Wrosch went to

the office of the association for medical treatment. He was referred to Dr. W. M. Pfeifer. His complaint to the doctor was that for the past four weeks he had been suffering from diarrhea, weight loss, and epigastric distress. Medication was prescribed and he was directed to return for further examination. He returned on April 29th, when he was again examined by Dr. Pfeifer, who concluded that he had a cancer of the digestive tract. He was then referred to Dr. A. G. Martin, who was the chief surgeon of the association. Dr. Martin examined him and suggested that he enter a hospital. He was in a hospital in Milwaukee from May 13 to May 22, 1949, when he was discharged. Dr. Martin found no evidence of cancer and diagnosed his illness as cardiospasm. The last time Dr. Martin saw Mr. Wrosch was on July 7, 1949. He had lost further weight and stated that he had difficulty in swallowing, no desire for food, a bad taste in his mouth, and a burning sensation in the pit of his stomach. His illness continued until he died on August 25, 1949. The death certificate, signed by another doctor, gave the cause of death as cancer. There was no suspicion that his death resulted from any but natural causes. No inquest was held and he was buried on August 29, 1949.

Some time thereafter a communication was sent to the office of the medical examiner and an investigation followed. The body was exhumed on February 11, 1950, and an autopsy performed the next day. Those present at the autopsy were Dr. E. L. Tharinger, the county medical examiner, Dr. L. J. Van Hecke, a prominent Milwaukee pathologist, Dr. L. J. Kreissel, Peter Sampon, a chemist, J. A. LaMonte, deputy medical examiner, and two ambulance men. The lungs, heart, stomach, liver, spleen, pancreas, kidneys, adrenal glands, the large bowel and small bowel, the bladder, the prostate gland, the brain, and some bone and hair were removed from the body and were examined by Mr. Sampon and later by Dr. Frank Kozelka, the state toxicolo-

gist. Both found arsenic in the body. Dr. Kozelka also found a high concentration of lead, which he described as a lethal concentration. Dr. Kozelka testified that in his opinion the arsenic and lead were taken into the body as lead arsenate, a product easily obtainable and used frequently for spraying fruit trees and shrubs.

After the defendant was arrested and retained counsel, the body of Mr. Wrosch was again exhumed on September 12, 1950, and there was a further autopsy. Those present at the second autopsy were Dr. J. J. Moore, a pathologist, Dr. Dean, his assistant, and Dr. Y. T. Oester, a pharmacologist and toxicologist, all of Chicago, who had been retained by the defendant, and Dr. Tharinger, Dr. Van Hecke, and Mr. LaMonte. Additional specimens were removed from the body and samples from the organs previously removed were made available to the doctors representing the defendant.

Dr. Tharinger and Dr. Van Hecke each testified that Bernhard Wrosch died of arsenic poisoning. Dr. S. B. Pessin, a pathologist, also testified as an expert. He was not present at either autopsy, but in answer to a hypothetical question he testified that in his opinion the death was caused by arsenic poisoning. Dr. Oester and Dr. Moore testified on behalf of the defendant, and in their opinion the death was not caused by arsenic poisoning. There was medical testimony that the symptoms complained of by Mr. Wrosch are consistent with arsenic poisoning. The autopsies revealed no cancer.

There was circumstantial evidence that the poison was administered by the defendant. A detailed review of this circumstantial evidence would unduly burden this opinion. There was testimony by one witness, May Pederson, of an admission by the defendant that she administered the poison to her husband. The testimony of Mrs. Pederson on this point is as follows:

"*A.* Yes, I seen her in September.
"*Q.* Of 1949? *A.* Yes, 1949.

"*Q.* Will you just tell us what transpired there on that visit. *A.* Well she came out there for some more vegetables and visited and we drove down the lane to the garden and I said to her—I was having quite a lot of difficulties with the mister, and I said, 'If things keep up the way it is I am going to walk out and let him have everything.' She said, 'Don't be a damned fool.' She says, 'Give him a dose of arsenic.'

"*Q.* What did you say? *A.* I said, 'Is that what you gave Barney?' She said, 'Yes, I gave him enough to kill an ox; he was so hard to die.'"

Throughout the trial Bernhard Wrosch was often referred to as "Barney."

There was ample credible evidence to support the finding of the jury, and the trial court did not err in refusing to grant the motion for a new trial.

When Mrs. Pederson was called to testify for the state, the defense made the following objection:

"If the court please, at this time we want to object to any testimony on the part of this witness on the grounds that the witness is mentally incompetent, on the grounds that the witness is morally irresponsible, on the grounds that the witness has no respect for the truth, and on the grounds that the witness does not understand the significance of an oath. We are prepared at this time to submit affirmative proof with reference to the objections that we raise at this time. We are prepared with witnesses to testify on these matters."

In the absence of the jury the trial court examined the witness under oath and at the conclusion of his examination he announced that he did not have the slightest doubt of her mental capacity to testify. The defense then stated that twenty-six witnesses were available to testify as to her mental competency. An offer of proof was made in the record as to the nature of the testimony of three of said witnesses. The trial court stated that the proof offered had nothing to do with the question of competency and refused to permit further offer of proof unless it was directly related to that

point. The defendant claims this was error. Sec. 325.30, Stats., provides:

"The court may examine a person produced as a witness to ascertain his capacity and whether he understands the nature and obligations of an oath."

The court followed the correct procedure in examining the witness under oath to ascertain her capacity to testify. The test is stated in the following quotation from 58 Am. Jur., Witnesses, p. 92, sec. 118:

"Owing to imperfect understanding of the nature of insanity, its many forms and varying effects, it was considered at common law that every insane person was wholly and absolutely *non compos mentis* and incompetent to testify. And the statement was broadly made in a number of American cases, most of which were decided in the first half of the nineteenth century, that insane persons and idiots were not competent witnesses. But in more recent times, the courts, keeping pace with the progress of science, have greatly relaxed the rigor of that rule and now agree that a lunatic or a person affected with insanity is competent as a witness if, at the time he is offered as a witness, he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue. Otherwise, he is not competent. In other words, a lunatic, from the condition of his mind, may not be a competent witness, but his incompetency on that ground, the same as want of capacity from infancy or other cause, must be determined by the court."

This rule has been followed in the following Wisconsin cases: *Burns v. State,* 145 Wis. 373, 128 N. W. 987; *Pawlak v. Pelkey,* 167 Wis. 367, 167 N. W. 427; *Hancock v. Hallmann,* 229 Wis. 127, 281 N. W. 703; *Markowitz v. Milwaukee E. R. & L. Co.* 230 Wis. 312, 284 N. W. 31. The trial court properly understood and announced the rule. The offer was of proof that might impeach the credibility of the witness but it would have been of no aid to the trial court

in determining the question at issue. We can see no error in his ruling.

It is next contended by the defendant that the trial court erred in permitting character witnesses to testify as to reputation based upon their own personal knowledge and not upon hearsay. As part of the defense five witnesses were called who testified that the reputation of May Pederson for truth and veracity and as a law-abiding and peaceful citizen in the community in which she resided was bad. In rebuttal the state called five witnesses who testified that her reputation in those regards was good. On cross-examination three of the witnesses stated that their testimony was based upon their own information and not upon what other persons had told them. Motions were made to strike their testimony but the trial court permitted it to stand, stating that it affected the weight of their testimony and that was a question for the jury.

When the reputation of a witness for truth and veracity has been attacked by the adverse party, such reputation may be sustained by testimony of other witnesses that it is good. Whether good or bad, the inquiry into the reputation is normally limited to the general reputation and it should not be based upon a mere opinion of the witness. The testimony of the supporting witnesses when given was in proper form and in answer to proper questions. The cross-examination developed that the witnesses testified without having a proper understanding of the questions. The cross-examination was not continued nor was the extent of the information of the sustaining witnesses gone into. The extent and method of such inquiries are within the discretion of the trial court. The testimony of three of the witnesses might have been stricken but we do not find that there was any abuse of judicial discretion in permitting the answers to stand and in permitting the jury to determine the weight to be given thereto. Certainly the effect of the testimony upon the jury could not have been prejudicial.

The defendant also contends that the court erred in refusing to instruct the jury as follows:

"You are instructed that to sustain an action for murder by poison, three things must be established beyond a reasonable doubt, (1) that the deceased died of a poison, and (2) that the poison was administered directly, or indirectly, by the accused, and in this connection possession of the accused of the poison, and the proposition of motive, together with the improbability of the administration of the poison by other agencies becomes material, and (3) that the accused had knowledge of the probable effects of the poison, and administered it with felonious intent. In order to sustain a conviction of murder by poisoning, these three essential elements must be established beyond a reasonable doubt, and each element must be established by the same degree of proof, to wit, beyond a reasonable doubt."

In particular, the defendant insists that there was no proof that the defendant at any time possessed poison and the showing of poison in the possession of the defendant is an essential element of the crime charged. Our attention is not called to any Wisconsin case that so holds. This identical point was raised in the case of *People v. Gerndt*, 244 Mich. 622, 630, 222 N. W. 185. In that case the court said:

"The appellant has also presented and urged the contention that the proof at the trial in the circuit was not sufficient to justify submitting the case to the jury, it being particularly stressed that there was no evidence tending to show the defendant possessed any arsenic or that he administered any to the deceased. This contention was made incident to the defendant's motion for a directed verdict and also incident to his motion for a new trial. While there was no direct testimony that the accused possessed arsenic or that he administered this poison to the deceased, it does not follow that there could not be a conviction based upon circumstantial evidence. To hold otherwise is to say that a prosecution for murder accomplished by poisoning cannot be successfully maintained unless there is direct and positive proof that the accused had the poison in his possession and that he adminis-

tered it to the deceased, thereby committing the crime charged. Such is not the law. If it were, in most cases murder by poisoning could be committed with impunity. In *People v. Kuhn,* 232 Mich. 310 [205 N. W. 188], it was held that positive proof of possession by the accused of the poison used was not necessary. It follows that the administration of the poison by the accused to the deceased may be established by circumstantial evidence. The facts and circumstances which resulted in a retrial of the *Kuhn Case* readily distinguish it from the case at bar in so far as the question of motive is concerned."

This rule was affirmed in the case of *People v. Franszkiewicz,* 302 Mich. 144, 4 N. W. (2d) 500.

The instruction given by the court was as follows:

"The jury is further instructed that before it can find the defendant guilty it must be convinced from the evidence beyond a reasonable doubt first that Bernhard Wrosch met his death by arsenic and lead poison or arsenic poison or lead poison and not from any other cause; and, second, that the arsenic or lead or both causing his death was administered to him in some manner by the defendant at one or more times during the weeks or months preceding his death with the premeditated design on her part to cause the death of said Bernhard Wrosch. If you are so convinced as to each of these two propositions and all elements of each beyond a reasonable doubt you should find the defendant guilty of murder in the first degree. If you are not so convinced as to each element referred to you should find the defendant not guilty."

The instruction given was correct and the requested instruction was properly refused.

The defendant further contends that the court erred in giving the following instruction:

"The state is not called upon to prove the precise manner in which the death of Bernhard Wrosch was caused. If you are satisfied from the evidence beyond a reasonable doubt that the defendant, Elsie Wrosch, is guilty of the crime charged, you should return a verdict accordingly, although

you may be uncertain as to the precise criminal means by which death was caused."

The information charged murder in the first degree in general terms, although the proof was confined to a claim of death by poison. The instruction complained of was followed by the instruction quoted above. When read together the instructions given show care in the preparation that correctly informed the jury of the law applicable to the case. In order to determine whether there is error in the instructions they should be examined as a whole, and we can find no error in the instructions given.

*By the Court.*—Judgment affirmed.