STATE EX REL. HUSSONG, Plaintiff in error, v. FROELICH, Defendant in error. [No. 123.]
HUSSONG, Plaintiff in error, v. STATE, Defendant in error. [No. State 66.]

*No. 123 and No. State 66.  Argued February 6, 1974.—
Decided March 5, 1974.*
(Also reported in 215 N. W. 2d 390.)

578

580

For the plaintiff in error there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendants in error the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the briefs was *Robert W. Warren,* attorney general.

HANLEY, J. The following issues are presented on review.

1. Whether the evidence educed at the preliminary hearing was sufficient to support a finding of probable cause.

2. Whether the evidence educed at the trial was sufficient to support the conviction.

3. Whether the action of the circuit court denying the defendant's motion for a change of venue constituted an abuse of discretion.

4. Whether the trial court erred in failing to grant the defendant's motion to suppress tape recordings of telephone conversations because of alleged unconstitutionality of Wisconsin statutes authorizing wiretaps and the alleged illegality in applying said statutes.

5. Whether the trial court erred in admitting several rifle shells into evidence.

6. Whether the trial court erred in refusing to permit the defendant to call a specific witness during postconviction motions.

7. Whether a new trial should be granted in the interest of justice.

*Preliminary hearing.*

The defendant herein challenged the validity of the bindover through the use of the writ of habeas corpus. The question raised is whether the evidence educed at the preliminary hearing was sufficient to bind over the defendant to the circuit court for trial.

On review of the validity of the bindover challenged by use of habeas corpus,[1] the burden which the state must sustain at the preliminary was set forth in *State ex rel. Marachowsky v. Kerl* (1951), 258 Wis. 309, 313, 45 N. W. 2d 668.

"It is well established in this state that the evidence at a preliminary hearing need not be sufficient to prove the charge against the defendant beyond a reasonable doubt. The reviewing court can examine the evidence only sufficiently to discover whether there was any substantial ground for the exercise of judgment by the committing magistrate. When the reviewing court has discovered that there is competent evidence for the judicial mind of the examining magistrate to act on in determining the existence of the essential facts, it has reached the limit of its jurisdiction and cannot go beyond that and weigh the evidence."

Thus, this court must examine the evidence to discover whether there was competent evidence for the judicial mind to act upon in determining the existence of the essential facts necessary for a finding of probable cause.

The fact of the crime is effectively admitted. While the defendant claims that sufficient evidence was not educed to prove how Neil LaFave was murdered, there is no claim that Neil LaFave died from natural or accidental causes.

As to the determination of whether there existed competent evidence for the judicial mind to act upon in determining whether there existed probable cause to believe that the defendant murdered LaFave, it is necessary to examine the evidence.

The evidence educed at the preliminary hearing was totally circumstantial. Circumstantial evidence is, however, sufficient to support a finding of probable cause

[1] *State ex rel. Dore v. Stoltz* (1969), 42 Wis. 2d 534, 167 N. W. 2d 214.

or guilt beyond a reasonable doubt. *State ex rel. Kanieski v. Gagnon* (1972), 54 Wis. 2d 108, 194 N. W. 2d 808. Likewise, the evidence educed at the preliminary was of a lesser quality than that educed at trial. However, it is not necessary to prove the defendant's guilt beyond a reasonable doubt therein.

The evidence at the preliminary sufficiently established the state's theory as to the crime, *i.e.*, that the deceased was initially shot and killed at Site 1 (S–1); that he was shot with a 30.06-caliber rifle and decapitated at Site 2 (S–2); that his body was buried at Site 3 (S–3) and that his head was buried at Site 4 (S–4).

Norman Hicks, a state game warden, testified as to the defendant's motive at the preliminary hearing—that the defendant stated he had a score to settle with the deceased because of previous dealings. Wayne John Trutlman, an investigator for the Brown county sheriff's department, testified that two .22-caliber shells were recovered at S–1. These shells were compared with other shells previously fired by defendant which had been recovered by Leon Pieschek, an investigator with the Brown county sheriff's department, and William Nooyen, a friend of the defendant's. Those shells recovered from S–1 were found to be identical to those previously fired by the defendant by William Rothman, a state crime lab ballistics expert.

While there was little evidence as to the cause of death—it being, however, inferable that whomever shot Neil LaFave likewise decapitated him—Dr. Billy Joe Bauman, a pathologist, testified that on the basis of presence of blood in the lungs of the deceased, it was his opinion that death was caused by gunshot wounds. Dr. Bauman likewise testified to bullet wounds in the deceased caused by a 30.06-caliber rifle. Several 30.06-shell casings were recovered from S–2. These shells were found to have been fired from the defendant's rifle which

had intentionally been secreted with the defendant's grandmother.

Finally, Mrs. Nancy Frank, an acquaintance of the defendant, testified that Hussong attempted to fabricate an alibi as to his presence during the period of time in question—September 24, 1971. Mrs. Frank also testified that she observed a knife on the passenger's side of the car on the evening of September 24, 1971. The presence of such a weapon had not been observed previously by Mrs. Frank.

Upon a review of the evidence we conclude there was substantial grounds for the exercise of judgment by the magistrate. We are also satisfied that there existed competent evidence for the judicial mind to act on in determining probable cause. Therefore, the order of the circuit court dismissing the petition for the issuance of a writ of habeas corpus is affirmed.

*Sufficiency of evidence at trial.*

The defendant contends that the evidence educed at trial was insufficient to sustain his conviction for first-degree murder. The test applied on appeal in determining whether the jury verdict of guilty is sustained by the evidence has recently been expressed by the court as follows:

"Reversal [of conviction] is required only when the evidence considered most favorably to the state and the conviction is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as beyond a reasonable doubt." [2]

The test is not whether this court is convinced of the defendant's guilt but whether the jury acting reasonably

[2] *State ex rel. Kanieski v. Gagnon, supra,* page 113.

could be so convinced. *State v. Shaw* (1973), 58 Wis. 2d 25, 205 N. W. 2d 132.

Since the proof of guilt in the instant action was entirely circumstantial, such evidence when taken together must be sufficient to convince a reasonable jury to a proper degree of certitude of the defendant's guilt.

"The evidence does not have to remove every possibility before a conviction can be sustained. *See State v. Eberhardt* (1968), 40 Wis. 2d 175, 161 N. W. 2d 287. The test stated in *State v. Johnson* (1960), 11 Wis. 2d 130, 136, 104 N. W. 2d 379, is 'that all the facts necessary to warrant a conviction on circumstantial evidence must be consistent with each other and with the main fact sought to be proved and the circumstances taken together must be of a conclusive nature leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the accused and no other person committed the offense charged.' The circumstantial evidence must, however, be sufficiently strong to exclude every reasonable theory of innocence, that is, the evidence must be inconsistent with any reasonable hypothesis of innocence. This is a question of probability, not possibility." *State v. Shaw, supra,* at page 29.

While the evidence educed at the trial in the instant case is not as conclusive as the usual case—said case consisting totally of circumstantial evidence—it is our opinion that a jury, acting reasonably, could be convinced beyond a reasonable doubt as to Hussong's guilt. Any piece of evidence taken in isolation of the rest may raise questions in the mind of the jurist. However, when the evidence therein educed is considered as a whole, each piece of the puzzle being properly in place, the conviction of the defendant may undoubtedly be sustained.

The defendant claims that the evidence when considered most favorably toward the state, is insufficient to convict him in several respects.

Initially, the defendant claims that the state failed to prove the cause of the victim's death and that such consti-

tutes a failure to prove that the defendant caused Neil LaFave's death.

The evidence educed at trial showed that Neil LaFave was shot in the head several times by a .22-caliber rifle. The head and neck were then torn away by several rounds delivered from a 30.06. Finally, the remainder of La Fave's head was viciously chopped off with a sharp instrument. All of these injuries individually could have caused LaFave's death.

The possibility that LaFave's death was caused by the wounds delivered from a 30.06 rifle was eliminated by the state's reconstruction of the crime itself. At a place in the Sensiba Wild Life Area located near the area where the body and head were found, referred to as Site 1, two .22-caliber shell casings were found. Also a close investigation of the ground at Site 1 indicated that a great amount of blood had soaked into the soil. It is at this site the state theorizes that LaFave was critically wounded. The body was then dragged about 50 feet to Site 2. The foliage at Site 2 was covered with blood and a great deal of brain-like matter to a height of five feet. There were several 30.06 shells found there also. It is at Site 2 the state contends that the defendant fired several rounds from a 30.06-caliber rifle into LaFave's corpse and then decapitated it.

After the victim's body was decapitated, it was dragged —leaving a bloody trail—to its grave at Site 3. The head was found nearby in a shallow grave designated at Site 4.

It is apparent upon a review of the evidence that Neil LaFave was killed by several shots from a .22-caliber rifle at Site 1. The fact that two such shell casings were found there and the fact that the foliage was bent and covered with blood at the spot where the corpse lay indicate that such was the case.

The drag marks from Site 1 to Site 2, the blood and brain matter stained foliage and the spent 30.06 casings indicate that the gruesome act of decapitation was there accomplished. Such evidence was capable of but one interpretation by the jury—that Neil LaFave was killed by several rounds from a .22-caliber rifle at Site 1 and that his body was later mutilated by the 30.06 rounds and a sharp bladed instrument at Site 2.

This interpretation of the facts of the crime was reinforced by the testimony of a pathologist, Dr. Harold Wagner, called by the defendant. Dr. Wagner testified that LaFave died as the result of two bullet wounds to the head. This testimony was based on his conclusion that the only possible explanation of the fact that blood was found in the deceased's left lung was that the deceased, after being knocked to the earth by the initial blast, took a breath. This breath forced blood into LaFave's left lung, the side upon which he had fallen.

Similarly, Dr. Wagner testified that his belief as to the cause of death was substantiated by the fact that the majority of the cutting wounds were found on the right side of the body. Reasoning that the bullet wounds were mainly found on the body's left side—i.e.,—the shots were fired as the assailant stood on the deceased's left side —and that the decapitation took place with the body's right side up, we think that such evidence was sufficient to enable a reasonable jury to conclude that Neil LaFave was murdered by gunshot wounds inflicted by a .22-caliber rifle at Site 1.

The defendant cites *State v. Wrosch* (1952), 262 Wis. 104, 53 N. W. 2d 779 as standing for the proposition that the jury must find the cause of death. Such is not the case. *Wrosch* involved a situation in which there was a conflict of proof as to whether the cause of death was poisoning or natural causes. Thus it was the opinion of the court therein that the charge of murder could only

be sustained if the jury found the cause of death was poisoning.

The initial evidence educed at the trial consisted of two spent .22-caliber casings found at Site 1 in the Sensiba Wild Life Area. These shell casings were identical to similar casings fired from the defendant's Remington .22-caliber automatic rifle. Metal slugs recovered from the victim's head were found to have rifling character-istics consistent with having been fired from a rifle similar to the defendant's. Additional tests could not, however, be performed because of the fact that the de-fendant had secreted the location of his Remington .22-caliber automatic rifle. On one occasion he stated it was buried.

Several 30.06 shells were recovered from Site 2 along with a number of brass jacketed bullets. No other high-caliber shells and slugs were found in the entire area. These shells were found to have been fired from the de-fendant's 30.06 rifle which he had attempted to secrete so as to avoid ballistic testing. The brass bullets found at Site 2 were similarly found to have been fired from the defendant's rifle. The presence of the defendant's 30.06 rifle was discovered as a result of telephone conversations between the defendant and his grandmother.

While any of the above evidence would individually be insufficient to support a conviction, when taken together, such evidence sufficiently supports the jury's finding of guilt beyond a reasonable doubt.

The defendant next claims that the evidence failed to prove his presence at the scene of the crime. Such a contention is without basis. While there was no eye-witness to testify that Hussong was present at the scene of the crime, such an eyewitness was not necessary. The presence of shells fired from two of the defendant's fire-arms at both locations where LaFave was shot is ample evidence to enable a reasonable jury to have found that

the defendant was present at the scene of the crime. Additionally, the defendant's attempts to secrete certain inculpating evidence and his unsuccessful attempt to fabricate an alibi as to his presence on September 24, 1971, are incriminating.

Finally, the defendant's claim that the state failed to show that the defendant had a sufficient motive to take the life of Neil LaFave is without merit. The testimony disclosed a number of heated contacts between the deceased and the defendant. On one occasion he vocalized a threat to the victim's superior. Hussong bore that ill-feeling and remarked about it the same month LaFave was murdered. Such evidence is sufficient to indicate the requisite motive for murder.

The facts educed at trial and reasonable inferences which are able to be drawn from those facts are sufficient to have enabled a reasonable jury to find the defendant guilty beyond a reasonable doubt. All facts upon which Hussong's conviction lie are consistent with each other and exclude any reasonable probability of innocence.

*Change of venue.*

The defendant moved for a change of venue in the instant action because he believed a fair and impartial trial could not be had in Brown county. Sec. 971.22, Stats. The court conducted hearings on that motion and affidavits and other evidence were introduced by the defendant in support thereof. On April 4, 1972, the court, having previously taken the matter under advisement, denied the motion.

The right to a change of venue because of the impossibility of a fair and impartial trial is of statutory and constitutional proportions. *Sheppard v. Maxwell* (1966), 384 U. S. 333, 86 Sup. Ct. 1507, 16 L. Ed. 2d 600; *McKissick v. State* (1971), 49 Wis. 2d 537, 182

N. W. 2d 282; sec. 971.22, Stats. The motion for a change of venue is addressed to the sound discretion of the trial court.[3] This court will not interfere with the trial court unless there has been an abuse of discretion.[4] The reason that this court is reluctant to interfere with the trial court is:

"The difficulty of impressing upon the record a true concept of the public sentiment in the county is manifest. Just as the trial judge is in a better position to weigh the testimony of witnesses who appear before him, so is he in a better position to judge of the public sentiment of the county. He is on the ground and in a position to sense, in a way that this court cannot, the true sentiment of the community and to judge much more correctly whether it is such as to prevent a fair trial on the part of the defendants." [5]

If there exists, from the evidence shown or the experience of the trial court, a reasonable likelihood that a fair trial cannot be had, then the court must grant the motion.[6] Failure to grant the motion or to take other remedial action under such circumstances constitutes an abuse of discretion.[7] Other remedial action consists of *voir dire* proceedings and continuance.[8]

On appeal, this court has the duty to make an independent evaluation of the circumstances.[9] Factors relevant to such a determination consist of the following:

"The inflammatory nature of the publicity; the degree to which the adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised,

[3] *Tucker v. State* (1973), 56 Wis. 2d 728, 202 N. W. 2d 897.

[4] *State v. Kramer* (1969), 45 Wis. 2d 20, 171 N. W. 2d 919.

[5] *Krueger v. State* (1920), 171 Wis. 566, 575, 177 N. W. 917.

[6] *State v. Tucker, supra,* at page 733.

[7] *State v. Alfonsi* (1967), 33 Wis. 2d 469, 147 N. W. 2d 550.

[8] *State v. McKissick, supra,* at page 545.

[9] *State v. Tucker, supra,* at page 733.

and the amount of difficulty encountered, in selecting the jury; the extent to which the jurors were familiar with the publicity; and the defendant's utilization of the challenges, both peremptory and for cause, available to him on *voir dire*. In addition, courts have also considered the participation of the state in the adverse publicity as relevant, as well as the severity of the offense charged and the nature of the verdict returned." [10]

In the instant case various pieces of evidence were introduced. Included therein were articles from Green Bay papers covering dates immediately after the commission of the crime, the preliminary examination and the trial in general, also included were two articles from national "criminal magazines" and several affidavits. Based on the inconclusiveness of such evidence and the court's experience in drawing a jury, the trial court held:

". . . I now find that the defendant has failed to establish to the satisfaction of the court that he could not obtain a fair trial in the County of Brown on account of community prejudice. The evidence supplied by the defendant in the form of affidavits did not supply in the opinion of the court the degree of proof of prejudice that is required to grant such a motion. . .

"I further find that the interrogation by the court and counsel did not display that there was any community prejudice prevalent against this defendant of such a nature so as to prevent the defendant from having a fair trial in the County of Brown."

Initially the defendant claims the trial court too strictly required the showing of actual prejudice and not merely the reasonable likelihood of prejudice that this court has required. Such, however, is not the case. The trial court applied the correct test in the determination of whether a change in venue should be granted. The trial court exercised its discretion based on its own experience and the inconclusiveness of the evidence be-

---

[10] *State v. McKissick, supra,* at pages 545, 546.

fore it that there existed no likelihood that a fair trial could not be had in Brown county.

The trial court is limited in its exercise of its discretion to the facts before it and, while the defendant need not prove that actual prejudice does exist, vague allegations of improper and prejudicial pretrial publicity and in- conclusive evidence thereof do not make a showing that the community was so infected with passion and prejudice as to make it likely that a fair trial could not be had. *State v. Kramer, supra,* at page 31.

In fact, evidence relevant to a determination of the likelihood of prejudice showed an absence thereof. The court, commenting on *voir dire* and impaneling of the jury, stated:

> "The record now shows that yesterday morning on the first day of this trial we commenced the selection of a jury from a panel of approximately 108 jurors; that 38 jurors were required to be impanelled for the purpose of accepting a panel at 24 jurors, and that I believe not more than six, probably seven, jurors were seated for the purpose of acquiring two alternates to sit in this case.
>
> "The court finds and determines that, based on the experience of this court and counsel in the interrogation into the qualifications of these jurors, that no difficulty was experienced in obtaining the jury that was free from prejudice and which was capable of giving the defendant a fair trial."

While such evidence is not conclusive,[11] it may be taken into consideration in determining the likelihood of prejudice.

> " 'The apparent difficulty or ease of securing a jury can be taken into account in passing upon the alleged abuse of discretion in refusing a change of venue.' " *Miller v. State* (1967), 35 Wis. 2d 777, 785, 786, 151 N. W. 2d 688, quoting from *Bianchi v. State* (1919), 169 Wis. 75, 93, 171 N. W. 639.

[11] *State v. Herrington* (1969), 41 Wis. 2d 757, 165 N. W. 2d 120.

Similarly, the timing, specificity, inflammatory nature and degree of permeation of publicity—both written and the product of radio or television—is extremely important in determining the likelihood of prejudice in the community.

"The type of news is important in the claim of potential prejudice. Uneditorialized news of purely informational nature may inform possible members of a jury but such news does not necessarily create prejudice. An informed jury is not necessarily a prejudicial one." [12]

It is obvious that a slaying and decapitation of a game warden would receive a greater amount of publicity than other events in any community in the state. However, the mere fact that such publicity has taken place is not conclusive of prejudice. If the publicity is informational in scope and does not constitute the type of editorialization and call to arms that was present in *Sheppard* and condemned in *Thomas,* such is not conclusive of prejudice.

We have reviewed the evidence presented in the instant action and believe that it does not constitute that which this court and other courts have condemned. The publicity was largely informational in scope. It contained no editorialization as to the guilt of the defendant.[13] That publicity which could be deemed sensational—the articles in the two crime magazines—was limited in scope. No evidence was in fact introduced as

[12] *Thomas v. State* (1971), 53 Wis. 2d 483, 492, 192 N. W. 2d 864.

[13] While an affidavit was introduced from the defense attorney's secretary concerning her interpretation of the statement of a news commentator on WLUK-TV to the effect that he believed the defendant to be guilty, no proof was elicited as to whether any of the jurors heard such a statement—if made. Rather, each juror testified that he had not formed an opinion as to the defendant's guilt or innocence and so swore.

to the readership of such magazines in the Brown county area.

The defendant argues that because of the very nature of the crime itself, it was error to fail to grant the motion for a change of venue. While the nature of the crime is relevant in a determination of whether a change in venue is warranted, that individual fact is not conclusive. In *State v. Hebard* (1971), 50 Wis. 2d 408, 184 N. W. 2d 156, this court upheld the trial court's denial for a change of venue in spite of the fact that the crime involved the murders of five family members in Brown county. Likewise the fact that jury deliberations were completed in a relatively short time for the complexity or length of a trial is not relevant in determining prejudice. The period of time spent in the jury room is inconclusive and often misleading in determining the impartiality of the jury.[14]

On the basis of the entire record before the trial court in the instant action, it is our opinion that the trial court did not abuse its discretion in refusing to grant the defendant a change in venue. Rather the record reveals that there did not exist a real likelihood that the defendant could not receive a fair trial as a result of community passion or prejudice or prejudicial pretrial publicity.

*Question of constitutionality of wiretap.*

The defendant claims that secs. 968.27–968.30, Stats. 1973, are unconstitutional in that they are overbroad and

[14] The basis upon which the court in *Johnson v. Beto* (D. C. Texas 1972), 337 Fed. Supp. 1371 inferred jury prejudice was the harsh thirty-year sentence imposed by the jury under Texas law for the mere gift by a "militant" black of a marijuana cigarette. While the length of time the jury deliberated was mentioned therein, such was not the basis upon which the court relied.

authorize "general searches," fail to provide for adequate notice and fail to require an inventory of interceptions.

The defendant initially claims that the Wisconsin Electronic Surveillance Control Law is unconstitutional in that it permits "general searches" and is violative of the requirements of limitedness and particularity as stated in *Osborn v. United States* (1966), 385 U. S. 323, 87 Sup. Ct. 429, 17 L. Ed. 2d 394; *Berger v. New York* (1967), 388 U. S. 41, 87 Sup. Ct. 1873, 19 L. Ed. 2d 1040; *Katz v. United States* (1967), 389 U. S. 347, 88 Sup. Ct. 507, 19 L. Ed. 2d 576.

The Wisconsin Electronic Surveillance Control Law was patterned after the federal surveillance statute, 18 USCA 2510, *et. seq.* It was created by ch. 427, Laws of 1969, and replaced sec. 885.365, Stats., which had prohibited the use of evidence obtained from wiretapping. The act permits the limited use of wiretapping and other electronic surveillance where such may provide or has provided evidence concerning the commission of or the conspiracy to commit specified crimes, including murder.[15]

The act permits the application to the circuit court of the county involved [16] by a law enforcement officer,[17] approved by the district attorney or attorney general,[18] for authorization of electronic surveillance. The application must include with specificity the identity of the applicants, a particular description of the nature and location of the facilities involved, the facts and circumstances relied upon by the applicant in seeking authorization, a statement as to the need of such surveillance and the period of time involved, and a statement concerning past applications and/or surveillances.[19]

---

[15] Sec. 968.28, Stats.
[16] Sec. 968.28, Stats.
[17] Sec. 968.30 (1), Stats.
[18] Sec. 968.28, Stats.
[19] Sec. 968.30 (1), Stats.

Upon such application, the court may require additional testimony. If the court determines on the basis of facts presented that:

(a) There is probable cause to believe an individual has, is or is about to commit an enumerated crime, and

(b) there is probable cause to believe that particular communications concerning that offense will be obtained, and

(c) no other investigative tool is reasonably available, and

(d) there is probable cause to believe that the facilities to be intercepted are commonly used by such person,[20]

the court may issue an *ex parte* order authorizing a specific electronic surveillance.[21] Included in the order authorizing interception must be, among others, "a particular description of the type of communication sought" [22] and the period during which such authorization shall be operative,[23] but no longer than thirty days.[24]

The contents of any interception must, if possible, be recorded and such recordings must, upon expiration of the authorization, be filed with the authorizing court.[25] Likewise within a reasonable time, but not more than ninety days from the application for a termination of the authorization, the authorizing judge must give notice to the persons named in the order of the electronic surveillance and an inventory thereof.[26]

This court has not expressly considered the constitutionality of the Wisconsin wiretap procedures although implied approval was given in *State ex rel. Arnold v.*

---

[20] Sec. 968.30 (3), Stats.
[21] Sec. 968.30 (3), Stats.
[22] Sec. 968.30 (4) (c), Stats.
[23] Sec. 968.30 (4) (e), Stats.
[24] Sec. 968.30 (5), Stats.
[25] Sec. 968.30 (7) (a), Stats.
[26] Sec. 968.30 (7) (d), Stats.

*County Court* (1971), 51 Wis. 2d 434, 187 N. W. 2d 354.

The federal statute upon which it was patterned has been upheld by all federal courts of appeal which have considered it. *United States v. Cox* (10th Cir. 1971), 449 Fed. 2d 679; *United States v. Cox* (8th Cir. 1972), 462 Fed. 2d 1293; *United States v. Cafero* (3d Cir. 1973), 473 Fed. 2d 489; *United States v. Whitaker* (3d Cir. 1973), 474 Fed. 2d 1246; *United States v. Bobo* (4th Cir. 1973), 477 Fed. 2d 974; *United States v. Tortorello* (2d Cir. 1973), 13 Cr. L. 4105. In our opinion the above cases are ample authority to support the constitutionality of Wisconsin's Electronic Surveillance Law.

The defendant's initial claim to the overbreadth of these statutes is that such statutes authorize such "long-term wiretaps" as were deemed unconstitutional in *Berger.* Such is, however, not the case. Sec. 968.30 (5), Stats., provides that:

> "No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than 30 days. . . . Every order and extension thereof shall contain a provision that the authorization . . . must terminate upon attainment of the authorized objective, or in any event in 30 days."

The order authorizing such surveillance was in accord with the statute in the instant case and a similar provision [27] has been upheld as fulfilling the requirements of *Berger.*

> ". . . [W]e are of opinion that the Act sufficiently circumscribes the time limit of effectiveness of orders so as to be unobjectionable in a constitutional sense. We are convinced that the Crime Control Act, because of its

---

[27] *See* 18 USCA 2518 (1) (d), (4) (e) and (5).

precise and discriminate requirements and its provision for close judicial supervision, does not violate the Fourth Amendment." *United States v. Bobo, supra,* page 982.

Next the defendant alleges that the Wisconsin Electronic Surveillance Control Law is unconstitutional in that it grants to the law enforcement officer too great a discretion as to the length of surveillance and the communications intercepted. We find both contentions to be without merit. Sec. 968.30 (5), Stats., provides that surveillance must terminate upon attainment of the authorized objective. Since sec. 968.30 (7) (a) requires that such interceptions be recorded, it is relatively simple to review such surveillance and determine if and when the objective of such surveillance was reached. If the surveillance continued thereafter, such surveillance is illegal and the evidence so obtained therefrom suppressible. *See United States v. Cafero, supra,* at page 493.

The defendant's argument that the act permits the officer too great an exercise of discretion as to the communications intercepted is likewise without merit. The Wisconsin act requires that the applicant for an order authorizing interception specify the "type of communications to be intercepted." This and the order likewise so limiting interception has been held sufficient to minimize the possible overbreadth problems from permitting too general a search.[28]

The fourth amendment only prohibits unreasonable searches. *Carroll v. United States* (1925), 267 U. S. 132, 45 Sup. Ct. 280, 69 L. Ed. 543; *Katz v. United States, supra. Berger* merely stressed the need for judicial scrutiny and protective procedures to avail an unreasonable intrusion of privacy. This is adequately provided for in Wisconsin.

[28] *United States v. King* (D. C. Cal. 1971), 335 Fed. Supp. 523; *United States v. Scott* (D. C. D. C. 1971), 331 Fed. Supp. 233.

Next the defendant claims that the Wisconsin statutory provisions are unconstitutional in that the discretion granted the authorizing judge to extend the order authorizing surveillance beyond the thirty-day limit authorizes that type of search proscribed by *Berger*. Such is not the case. Rather, before a judge may extend the period of surveillance beyond the thirty-day limit he must again fulfill the requirements of sec. 968.30 (1) and (3), Stats. This involves a fresh showing of probable cause and a reasonable explanation as to the failures already encountered. Such is sufficient to satisfy the requirements of *Berger*. Additionally, since the interception in the instant case ceased after slightly more than a week upon realization of its objectives, we see no bases for a challenge to this aspect of the Wisconsin Electronics Surveillance Control Act.

The defendant claims additionally that the notice requirements of sec. 968.30, Stats., are constitutionally infirm. The claim is without merit. Initially it is clear that the defendant was notified two days after such surveillance had ceased. Such notice was well within the statutory ninety-day maximum. At any rate, the Wisconsin notice requirements are exact to those of 18 USCA 2518 (8) (d) which have been upheld. *United States v. Cafero, supra*.

In the instant case the defendant moved to suppress the evidence obtained through electronic surveillance. The grounds for said motion were in absence of probable cause and the resulting illegality of the wiretap. The denial of the motion was proper.

A hearing was held on December 7, 1971, before Hon. DONALD W. GLEASON, Judge of Branch 1 of the 14th Judicial Circuit of Wisconsin. In determining whether to approve an order for electronic surveillance of a telephone used by the defendant, Judge GLEASON had before him considerably more than the mere conclusion of a law

enforcement officer that other investigative procedures were not successful.

At the hearing Sergeant Gerlikovski stated that the means of investigation used in the case prior to the application for a wiretap included a search of 40 to 60 acres of the crime scene, use of a metal detector, scientific laboratory testing, stake-outs, interviews with over 200 people and polygraph examinations. He stated that all available leads had been followed up.

Included in the application was an affidavit of Donald R. Zuidmulder, district attorney for Brown county, stating the facts and circumstances relied upon for issuance of an order permitting electronic surveillance.

The affidavit of the district attorney consisted of much the same evidence that was testified to at the preliminary and at which probable cause found to exist. The evidence consisted of the fact that the defendant carried a grudge against the victim because of his previous encounters with LaFave. That on September 24, 1971, the defendant was observed driving in the general area of the crime. Additionally evidence was shown that the .22-caliber shells found in the area in which the crime was committed were identical to the shells previously fired from the defendant's rifle. That the defendant stated to Greg Kraft that his .22 might be the murder weapon and that he had buried said rifle. Likewise, evidence was introduced that the defendant attempted to fabricate an alibi and that he was afraid of running into detectives.

Upon the basis of the above-described evidence, it was the opinion of Judge GLEASON that probable cause existed that Brian Hussong was directly involved in the murder of Neil LaFave. On a review of the evidence we think the finding was correct.

At the time of the application for the wiretap several pieces of evidence concerning the crime had yet to be recovered. Initially, the location of the .22-caliber rifles

involved in the crime were not known. Additionally, the belief that the crime in question was committed during a fifteen-minute interval had yet to be disproved.

As a result of such a situation—and the fact that a continual dialogue was taking place between Greg Kraft and the defendant concerning the rifles—it was believed that certain conversations would take place between Hussong and conspirators or others concerning the commission of the crime. Such a belief that communication relevant to the crime would take place was correct.

The existence of probable cause necessitates a finding that a reasonable man, when faced with the evidence of the individual case, would believe that particular communications concerning the offense could be obtained through surveillance. On the basis of the aforementioned evidence, Judge GLEASON concluded that the requisite probable cause did exist. We think the finding was correct.

*Introduction of duplicate tapes.*

The Wisconsin Electronic Surveillance Control Law is very specific in regards to the control and use of intercepted material. Upon expiration of the order authorizing interception, the tapes must be filed with the authorizing court and then sealed.

The tape recordings of the defendant's intercepted telephone conversations introduced into evidence were not original recordings but duplicates produced by playing back the originals and recording them on an identical recorder patched into the first.

The defendant objected to the reception of these recordings on the ground that no foundation had been laid. We think the defendant's objection was insufficient to avoid waiver.

It has been the rule in this jurisdiction that an objection to the admissibility of evidence must be specific in stating the ground of the objection; objections to the

admissibility of testimony not specific enough to raise the precise question upon which the objection relies are inadequate to preserve the objection on appeal. *State v. Hoffman* (1942), 240 Wis. 142, 150, 151, 2 N. W. 2d 707.

Here the defendant does not challenge the accuracy of the intercepted tapes and in fact testified as to their accuracy. Under the provisions of sec. 968.30 (7) (a), Stats., intercepted recordings must be filed with the court issuing the order and sealed by the court and preserved for a period of ten years. Had proper objection been made to the use of duplicates, the originals were readily available.

*Admission of 30.06-caliber shells.*

The defendant argues that the admission of several 30.06 shells constituted error in that acts not connected with the accused—acts of strangers are inadmissible as evidence. 29 Am. Jur. 2d, *Evidence,* p. 344, sec. 299; 22A C. J. S., *Criminal Law,* p. 406, sec. 602. What the defendant is in effect arguing is that the 30.06 shells were fired by a third party and thus are inadmissible as evidence against the defendant.

A review of the evidence proves the defendant's contentions to be unmeritorious. The state proved that the defendant owned the instrumentality of the crime—the 30.06-caliber rifle. This fact was admitted by the defendant. The state likewise proved that the shells found at Site 2 had been fired from the defendant's rifle. The state also proved that the defendant had exclusive control over the 30.06-caliber rifle. Therefore, it was not error to permit introduction of the rifle and the shells fired from that rifle which were found at Site 2 at the trial.

*Denial of new trial.*

The defendant claims that the trial court erred in refusing defendant's permission to call William Nooyen,

a recanting witness, during the postconviction motions. We do not agree. The mere fact that an individual witness recants and alleges that he perjured himself at trial is insufficient grounds for a new trial unless accompanied by other newly discovered evidence. *Nicholas v. State* (1971), 49 Wis. 2d 678, 183 N. W. 2d 8; *Zillmer v. State* (1968), 39 Wis. 2d 607, 159 N. W. 2d 669.

*New trial in interest of justice.*

A new trial in the interest of justice will lie only when, in this court's exercise of discretion, justice demands a new trial and that a different result would be obtained under optimum circumstances.

In *Commodore v. State* (1967), 33 Wis. 2d 373, 383, 147 N. W. 2d 283, we said that, for that power to be exercised, "Such grave doubt must exist regarding a defendant's guilt to induce the belief that justice has miscarried." From the record in this case we have no grave doubt of the defendant's guilt. Defendant was found guilty of first-degree murder on the basis of probative and credible evidence. A review of the evidence indicates that justice was not miscarried.

*By the Court.*—Judgment and orders affirmed.